MARGIE H. FERGUSON *vs.* BOSTON GAS LIGHT COMPANY.

Suffolk.    November 19, 1897. — January 8, 1898.

Present: FIELD, C. J., KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Negligence — Action — Law and Fact.*

If a gas company, upon being notified of a leak of gas in a house, sends a workman there, who discovers a leak in the chandelier in a certain room, and, after working upon it for about twenty minutes, informs the occupant of the room that he has remedied the leak and that the room will be perfectly safe for occupancy, and such occupant, after remaining in the room throughout the evening without noticing any odor of gas, retires there, and is injured by inhaling gas which escapes during the night, an action against the company for his injury should have been left to the jury.

TORT, for personal injuries occasioned to the plaintiff by the inhalation of illuminating gas, which escaped in the night time from a leak in a gas pipe of a chandelier in a room occupied by the plaintiff, through the alleged negligence of the defendant.

Trial in the Superior Court, before *Mason*, C. J., who allowed a bill of exceptions, in substance as follows.

The plaintiff introduced evidence tending to show the following facts.  The house in which the plaintiff lodged was situated at No. 11 Dartmouth Street, Boston, and was supplied with gas by the defendant.  The plaintiff's room was the back parlor on the first floor above the basement.  The only gas fixtures in the plaintiff's room were a chandelier, which hung from the centre of the room, and a one-bracket side light.  This chandelier was constructed of a small gas pipe running down from the ceiling, called the distributor, from the lower end of which three very

small pipes branched at right angles, which were called the arms, each arm having a burner at the end and a metal stopcock near the burner, and all these pipes were incased with ornamental bronze coverings, the casing of the arms having openings along the top of about the width of a finger, but not wide enough to allow fingers to reach around or under the pipes. The plaintiff never made use of this chandelier, but used only the side light and a kerosene lamp. She used this room as a living and sleeping room, and for her business of dressmaking. The pipes of the defendant extended from the street only to the line of the house. The pipes and the fixtures within the house were not maintained by the defendant.

The plaintiff put in evidence a gas bill of the defendant for gas used at No. 11 Dartmouth Street, dated November 1, 1895, which had at the bottom the following printed words, namely, a heading in large letters, "Notice to Gas Consumers," and below, in smaller type, "To avoid unnecessary complaints, and to prevent accidents, regard should be given to the following rules: ' As soon as a leak of gas is perceived, whether by day or night, immediate notice should be sent to the West Street office of the company. When the smell of gas is apparent in a room, no light or fire should be permitted, and especially no match should be lighted ; the windows should be opened, and the room left unoccupied.' "

There was also evidence tending to prove that the defendant carried on in the fourth story of its offices at 24 West Street, a jobbing department, where complaints of leaks inside the buildings of its customers were sometimes received, and jobbers were employed and sometimes sent out to repair leaks in fixtures; and that, about seven o'clock on the morning of December 14, 1895, the plaintiff's room was discovered to be full of gas, and the plaintiff was found in bed asphyxiated by gas to such a degree as to be unconscious, and she received the injuries complained of.

Helen C. Hildreth, a witness called by the plaintiff, testified that she carried on No. 11 Dartmouth Street as a lodging house, and the plaintiff was one of her lodgers and occupied the back parlor for her business as a dressmaker and for her living and sleeping room, and had so occupied it for about two months prior to

December 13, 1895 ; that the bed in the room was in the form of a sofa by day and a bed at night; that she was familiar with the above notice, having frequently read it upon her gas bills ; that two or three days before the accident the plaintiff reported to her that there was a slight odor of gas in her room ; that a man from the defendant's office called at the house about the meter, and she told him there was a slight odor of gas in the back parlor, and he said he would send a man to attend to it ; that on December 13, about four o'clock in the afternoon, a man came to the house, and said that he came from the defendant in regard to a leakage of gas ; that she took him immediately into the plaintiff's room, and went in with him ; that he went to the chandelier, took out all the stops, put them back, and said they were all right, then took out his tools and went to work at the chandelier ; that then she was called out of the room, and when she came back she asked him if he had found the leak, and he said he had, and, as she remembered, he said it was in the joint ; that she asked him if it was safe, and he said it was perfectly safe, and that it was safe for a person to sleep in the room, but also said, " I will come in the morning early and look after it again " ; that he never called again ; that he had a bag with him containing his tools ; that he worked upon the chandelier with a small tool, and stood on a chair while so working; that the next morning the plaintiff's sister came down and said the gas was leaking very badly ; that she went up, and found the room was full of gas ; that she sent immediately to the Brookline Gas Light Company, and two men came from that company, reaching the house about ten o'clock ; that the gas had been pouring out all the time ; that it was not from the stops, which were all correct, as she examined them herself ; that the gas came from the chandelier ; that the men said the chandelier could not be repaired there, it would have to be taken to the shop; and that they took it down and carried it away in their wagon.

On cross-examination, she testified that, when she first had the conversation with the messenger who came from the defendant, the leak was so slight as not to interfere with a person occupying the room; that the first visit of any messenger from the defendant was not for the purpose of repairing any leak, but

for the purpose of examining the meter, because she thought her gas bills were too large; that there was no odor of gas after the man went away; that she was in the room in the evening for the purpose of seeing whether there was any odor, and there was none; that she noticed the slight smell of gas nowhere else in the house except in this room; that the man who did something to the chandelier went to the side light and examined that with a match and examined the stop, and said the leak was not there; that when he took out his tools and went to work on the chandelier, he began on one of the arms; and that he told the witness that he found the leak in the chandelier.

The plaintiff testified that she was a dressmaker, and had occupied the back parlor of No. 11 Dartmouth Street for about two months before the accident; that on the morning of December 13 she smelt a slight odor of gas, and notified Mrs. Hildreth; that between four and five o'clock of that day she was in her room, and her door was partly open, and the door bell rang, and, Mrs. Hildreth having answered it, she heard a man say, " I am sent by the Boston Gas Light Company to repair the leak in the chandelier "; that he came into her room with Mrs. Hildreth; that he had a bag with him and there were tools in the bag; that he took something out of the bag, and standing on a table under the chandelier worked on the chandelier with some tool, from twenty minutes to half an hour; that he had something in a paper, but she could not say whether he put it into the chandelier or not; that when he finished he picked up his tools and said it was all right; that she asked him, " Are you sure? " and he said, " Yes "; that after he left, the windows were raised and the room was aired; that she occupied the room during the evening, and retired about eleven o'clock; that there was no odor of gas after the man left until she retired; that she did not use the chandelier after the man fixed it, and she saw no one else touch it or interfere with it in any way; that before she retired she turned the gas off of the side light; and that that was the last she knew until the next morning, when her first recollection was that she was sitting by an open window in a chair.

On cross-examination, she testified that the trouble before the man came was a very slight one, and did not prevent her occu-

pation of the room ; and that it did not amount to much on the morning of December 13.

Flora Ferguson, a sister of the plaintiff, called by her as a wit· ness, testified that she was in her sister's room on December 13 when the man came to fix the gas ; that he went to the side light, examined it, and said the leak was not there ; that then he set his bag on a table, stepped up in a chair beside the table, and examined the chandelier all around the arms, then he took tools out of the bag, and picked at the chandelier in one place more than another ; that he had a paper in the bag, and he took it out, and he had something in the paper, and he put one foot on the table and worked in that way ; that he picked with a tool and said that he had discovered the leak ; that he took something out of the paper, put it in his hand, and put it on the chandelier at the part at which he was picking ; that she did not see what the substance was in the paper ; that he worked at the chandelier about twenty minutes, then he got down from the table and said it was all right; that her sister asked if it was all safe now, and he said that it was ; that she asked whether it was all right to stay in the room, and he said it was, that there was no danger ; that after he left they opened the windows and aired the room ; that she and her sister remained in the room during the evening ; and that she left about half past eight o'clock, and up to that time she perceived no odor of gas whatever.

On cross-examination, she testified that she did not remember whether or not she saw him take the cocks out of the chandelier ; that she was walking about the room getting things in order ; that he had a tool in his hand and kept working at the chandelier, picking into it ; that he would blow his breath on it and rub it with his finger ; that he was picking on the chandelier at that part of the arm which was near the light; and that she could not say whether he dug anything out of the chandelier.

John Holsterman, a witness called by the plaintiff, testified that he was a steam fitter by trade, now working for the defendant, but in December, 1895, he was working for the Brookline Gas Light Company ; that at that time his duties were setting meters, fixing leaks, and doing general repairing ; that he had worked for the Brookline Gas Company about two years ; that

during that time he had been in something over a hundred houses, repairing leaks in fixtures, leaks in gas pipes, and leaks in services, where they come into the houses, and was familiar with the methods of repairing by practical experience; that about December 16, 1895, he thought, this chandelier, by orders of his foreman, was taken by him to No. 11 Dartmouth Street, and hung up there; that recently he was present at No. 11 Dartmouth Street, and saw one Dowling take down this chandelier, and take the casing off, and saw the solderings pointed out by Dowling as his work, which were on the outside of each of the cocks on the arm, where the arm makes into the cock; that the brass casing came pretty close around the arm and formed a kind of covering for it, with an opening at the top wide enough to get a screw-driver down to get at the cock if one wanted to tighten it up, but one could not get his fingers around the pipe, but only right on top of the pipe; that there were two substances, cement and soap, that a skilled workman would undertake to repair a leak in a gas pipe with; that there were not any more than those two that he knew of, and that it required heat to use cement; that soap was only used in a slight leak; that in order successfully to use it a workman would take the soap and work it into the joint with his fingers; that it was the working in with the finger that is the important part; that soap could not have been properly used to repair this leak, because, on account of the metal casing around the pipe, the fingers could not reach around the pipe, so as to do the working in of the soap that was necessary properly to stop a leak in it; that in order to stop a leak there it would be necessary to take the casing off; that, if this leak could not be properly stopped with soap, the proper thing to be done by a workman would be to shut the gas off, take the fixture down and cap it up; and that, if they would not let him cap it, to shut the gas off altogether, or let them take the responsibility themselves.

Edward S. Dowling, a witness called by the plaintiff, testified that he was a gas fitter and jobber, and worked for the Brookline Gas Company in December, 1895; that recently he went to No. 11 Dartmouth Street, took this chandelier down, and took the casing off, and recognized the place where he had soldered it in December, 1895; that his memory served to re-

call the kind of hole he soldered; that before he soldered it, he tested it, and found a slight leak on the arm away back of the stopcock; that the arm of the gas fixture was not broken off; that there was some stripping off of the threads, where the cock had been screwed on the arm fixture; that after he soldered it, he again tested it, and found it tight; that these arms are one eighth of an inch pipes, and very small; and that he could disable the fixture with his hand in a very few minutes.

On cross-examination, he testified that the leak in this chandelier was directly back of the stopcock; that the hole in the pipe was like a stripped thread or slight break; that it was very small, about one sixteenth of an inch long, and just about wide enough to pass a pin into; and that it would be fairly described as a crack in the pipe.

James J. Lovett, a witness called by the plaintiff, testified that about the middle of December, 1895, he was sent by the superintendent of the Brookline Gas Light Company to No. 11 Dartmouth Street, to see about a leak there; that he found a leak in the chandelier on the first floor in the rear room, and the smell of gas was strong when he went into the room; that he found it defective, and found there was a strong odor of gas coming from it, or from one of the arms; and that he took the chandelier down, capped it, and brought the chandelier out to the works at Brookline.

Frank E. Smith, a witness called by the defendant, testified that he was in its employ as auditor at 24 West Street; and that on December 13, 1895, he made out a written order to go to No. 11 Dartmouth Street, " To find out and see what accounts for large bills," and " Follow this up," and gave it to the foreman of the jobbing department.

On cross-examination, he testified that the superintendent of the jobbing department had charge of all the men who are sent out to make repairs of leaks in buildings.

Andrew P. Richardson, a witness called by the defendant, testified that he was employed in the jobbing department of the defendant; that on December 13 he was sent to No. 11 Dartmouth Street, with the written order made out and signed by the auditor; that instructions were given him at the time to take the state of the meter, to see if any mistake had been

made in taking the state of the meter; that it was about ten o'clock in the forenoon when he was there; that while at the house, Mrs. Hildreth informed him that there was a leak of gas in the back room on the first floor, but the lady was out and they could not get in, as the door was locked; that then Mrs. Hildreth called his attention to a leak in the chandelier in the front room, and said it had been leaking a long time, and that there was a slight smell of gas when they passed under the chandelier; that he did not go into the back room at all; that he found a slight smell of gas under the chandelier in the front room; that the odor was very slight, and might come from a loose key or stopcock which wanted tightening up; that in his judgment the leak was very small, by the odor of the gas which escaped; that he did not examine it, and in his judgment no injurious results would have been effected by a leak of this description; that he told Mrs. Hildreth that he would report to the office, and some one would probably come up that afternoon and look at it; that while he was at Mrs. Hildreth's he made a memorandum on the back of the written order given him to go there (which order was put in evidence by the defendant) in these words, "Leak — Chandelier"; that at about a quarter past one on the same day he reported in writing to one Vialle, the regular officer to receive complaints at the defendant's West Street offices; and that he made out an order and stamped it with a time stamp.

On cross-examination, he testified that the report he made to Vialle was that there was a leak in the chandelier at No. 11 Dartmouth Street requiring attention; that he asked him to send up that afternoon; that Vialle entered it upon a book, and that an order was made out and stamped with a time stamp, which every order was stamped with; and that he was the man by whom Mrs. Hildreth sent the notice to the defendant that there was a leak in the chandelier, and he reported it to the office.

Lewis H. Lawrence, a witness called by the defendant, testified that he was in the employ of the defendant in December, 1895, doing jobbing work and attending to leaks; that on December 13, 1895, about one o'clock in the afternoon, he received an order to go to No. 11 Dartmouth Street; that he arrived

there about five o'clock, he should judge; that he rang the bell and was admitted by Mrs. Hildreth; that he said he came about a gas leak, and asked her where it was; that Mrs. Hildreth directed him to the front room on the first floor above the basement; that he entered the room, and no odor of gas was perceptible; that he got upon a chair and found a slight odor of gas in the chandelier; that he greased the cocks, and then examined the fixture and smelled of it to see if he could get any odor of gas; that there seemed to be a slight odor at the distributor, which is the central part of the fixture where the arms come out from the centre of the fixture; that the leak was a very slight one, and he did not believe that it would have made the room uninhabitable; that he could not have got at the leak without taking off the arms so as to get at the distributor; that he told Mrs. Hildreth that they would fix it if she could wait, if not she would have to get a gas fitter and have it fixed; that he had grease with him to grease the cocks, but had no soap with him and made no use of any soap about the chandelier; that he did not go into any room in the house other than the front parlor, and when he went away he had not undertaken to do anything with the small leak which he thought he found; that when he left the room there was nothing about the fixture which was in any manner dangerous or that permitted an escape of the gas, and that she called his attention to no other leaks; that he fixed chandeliers and fixtures, and did anything he was sent out to do, so far as finding out where a leak was; that he had been at a great many houses and done a good deal of similar work; that he used no tools except a screw-driver and took nothing from a paper, and used nothing but grease; and that he had no bag with him.

On cross-examination, he testified that the order he had with him was a " regular leak order," printed; that he was there about twenty minutes, although it might have been half an hour; that it was at least three months after December 13 when he was first called upon to remember what he did respecting this fixture; and that in the mean time he had gone to a great many houses and had done a good deal of similar kind of work, and had never been up there since.

Dr. Jernegan, called as a witness by the plaintiff, testified

that the gas used in this case, being water gas, contained carbonic oxide, which is the dangerous element of the gas, mixed with naphtha fumes among other elements; that the carbonic oxide is comparatively inodorous, and is the heaviest element, and descends while naphtha fumes rise; and that the odorous part of this gas is not dangerous. There was also evidence that the defendant's gas contained about twenty-five per cent of carbonic oxide, and that carbonic oxide is a deadly poison. No witness testified directly that any soap had been used in the repair of this chandelier, or was at any time found anywhere about it.

At the close of the evidence, the judge ruled that the plaintiff could not recover; and directed a verdict for the defendant.

The plaintiff alleged exceptions.

*E. O. Shepard*, for the plaintiff.

*S. Lincoln*, (*H. W. Ogden* with him,) for the defendant.

BARKER, J. The evidence would clearly justify a finding that the defendant undertook to find and stop the leak of gas, and in pursuance of this understanding sent a workman who attempted to fix the chandelier in the plaintiff's room. Entering upon the work the defendant was bound to do it with reasonable care. In our opinion, the evidence would also justify a finding that the work was not done with reasonable care, but negligently, and that the plaintiff's injury was the consequence of this negligence, and was not occasioned or contributed to by any act or fault of her own. The case should have been left to the jury.

*Exceptions sustained.*